## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Thomas Nevin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.     I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since November of 2008. I am a graduate of the Federal Law Enforcement Training Center and the ATF Special Agent Basic Training Academy.  I am currently assigned to the Nashville Field Division, in the Mobile, Alabama Field Office. During my tenure with ATF, my investigative experience has been concentrated in the areas of firearms trafficking, violent crime and firearms related violations.

3.     During the course of my training and experience and through conversations with other more experienced law enforcement officers, I have learned of various methods used by firearms traffickers, as well as mere possessors of illegal firearms and accessories, to conceal their assets, income, and activities from the government and other third parties.  Based on my

training and experience, and through conversations with other officers and agents, I know the following:

- Traffickers often utilize electronic devices and social media platforms/applications to facilitate communication with co-conspirators and/or store contact information (i.e., names, telephone numbers, physical address, e-mail address, usernames, etc.) of associates.

- Traffickers often utilize multiple electronic devices and/or social media platforms/applications in an effort to compartmentalize their firearms trafficking businesses. Multiple electronic devices and/or social media platforms/applications are often utilized in an effort to maintain anonymity and independent contact between sources of supply and a range of customers.

- Traffickers maintain records, receipts, notes, ledgers, and other items relating to the transportation, ordering, sale and distribution of firearms and controlled substances, which are usually maintained where the traffickers have ready access to them, and which are often stored on digital media or an iCloud type service.

- Traffickers commonly maintain identifying information in electronic devices which list names, telephone numbers, physical address, e-mail address, and usernames of their various associates in the trafficking organization; such records are normally maintained within places/things under their control.

- Traffickers take or cause to be taken photographs and videos of themselves, their associates, their property, and the illegal firearms, firearms parts and accessories and narcotics they distribute, and often maintain these photographs within places/things under their control, including on electronic devices or an iCloud type service.

- Traffickers commonly use electronic devices to communicate with their criminal associates and those electronic devices are commonly carried with them or kept at locations under their custody and control, such as their residences and vehicles, and contain names, telephone numbers, physical address, e-mail address, usernames and other information stored in the electronic devices.

- Traffickers commonly are involved in money laundering and retain records of their transactions within places/things under their control. Records of this kind are also often stored within electronic devices, digital media, or an iCloud type service.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. All dates, locations, and amounts referenced in my affidavit are approximations.

5.     Pursuant to 18 U.S.C. § 3051, I am empowered to enforce criminal laws of the United States. As a result of my training and experience, I am familiar with federal firearms and ammunition laws of the United States, including 18 U.S.C. § 922(a)(1)(A) which makes it unlawful for any person except a licensed imported, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

6.     As a result of my training and experience, I am also familiar with 18 U.S.C. § 932(b)(2) which makes it unlawful for any person to knowingly purchase, or conspire to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person, knowing or having reasonable cause to believe that such other person intends to use, carry, possess, or sell or otherwise dispose of the firearm in furtherance of a felony, a Federal crime of terrorism, or a drug trafficking crime.

7.     As a result of my training and experience, I am also familiar with 18 U.S.C. § 933(a)(1) which makes it unlawful for any person to ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony (as defined in section 932(a) and 18 U.S.C. § 933(a)(2) which makes it unlawful for any person to receive from another person any firearm in or otherwise affecting interstate or foreign commerce, if the recipient knows or has reasonable cause to believe that such receipt would constitute a felony

3

and 18 U.S.C. § 933(a)(3) which makes it unlawful to attempt or conspire to commit the conduct described in paragraph (1) or (2).

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 922(a)(1)(A), 932 (b)(2), 933(a)(1), 933(a)(2) and 933(a)(3) have been committed by Elder ALVRIDREZ "URIEL ALVIDREZ " (https://facebook.com/uriel.alvidrez), and individuals known to ATF through their Facebook accounts to include "PEPE MARTINEZ" (https://www.facebook.com/profile.php?id=100008308984074), Jose Luis CABALLERO (https://www.facebook.com/joseluis.caballero.90) and Juan CANTU-CAVAZOS (https://www.facebook.com/juan.cantu.7169). There is also probable cause to search the information described in Attachment A for evidence of these crimes or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

9.      On April 11, 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Mobile, Alabama Field Office initiated a firearms investigation based on intelligence referrals from the Mexico Country Office (herein referred to as "MCO"). The intelligence referrals referenced two separate incidents that occurred in Tamaulipas, Mexico where three (3) firearms were recovered. All three (3) firearms were purchased from the same Federal Firearms Licensee (FFL# 16303283) Carneys One Stop, located at 80 Country Rd. 20, Butler, Alabama 36904.

10.     According to MCO Referral # 22-150, Mexican authorities recovered an American Tactical Imports, model MIL-SPORT, 5.56 caliber rifle, SN: MSA082236 on or about February 9, 2022. This firearm was traced through ATF's National Tracing Center (herein

4

referred to as "NTC"), Firearms Trace Summary (herein referred to as "FTS") #T20220069665. FTS # T20220069665 identified Carney's One Stop as the FFL and an Alabama resident as the purchaser with a purchase date of October 28, 2021. The FTS noted that the Time To Crime (herein referred to as "TTC") was 104 days (104 days from purchase to recovery).

11. According to MCO RFL 22-173, Mexican authorities recovered a Diamondback Arms, model DB-15, 5.56 caliber rifle, SN: DB2198602 on or about March 10, 2022. The NTC, FTS #T20220127869, identified Carney's One Stop as the FFL and an Alabama resident as the purchaser with a purchase date of February 24, 2022. The FTS noted that the TTC was 14 days (14 days from purchase to recovery).

12. According to MCO RFL 22-175, Mexican authorities recovered (from the same event as MCO RFL 22-173) a Diamondback Arms Inc., model DB-15, 5.56 caliber rifle, SN: DB2198865 on or about March 10, 2022. The NTC, FTS #T20220127892 identified Carney's One Stop as the FFL and an Alabama resident as the purchaser with a purchase date of February 14, 2022. The FTS noted that the TTC was 24 days (24 days from purchase to recovery).

13. Based on the information provided by the FTS's, ATF interviewed the original purchasers of the rifles recovered in Mexico. While both purchasers admitted to having bought firearms from Carney's One Stop, both denied having purchased any of the rifles recovered in Mexico.

14. ATF then interviewed the owner of Carney's One Stop, John BECTON (herein referred to as BECTON), and reviewed the ATF Form 4473's completed by the purchasers of the rifles recovered in Mexico. BECTON denied knowing how the firearms could have traveled to Mexico, but he confirmed that there were numerous Mexican migrants and Texans working

5

construction on the pipeline in Choctaw County and that they had come into his store. Furthermore, BECTON admitted to selling firearms to individuals he believed worked on the pipeline and mentioned that some of them had odd looking identification cards, which the ATF Agents presumed to be Permanent Resident cards.

15.     Upon examining the ATF Form 4473's used to compete the transactions for the recovered rifles in Mexico ATF Agents noted that the forms had been altered.  ATF Agents noted that additional firearm(s) were added to the forms by writing over strike through lines. Furthermore, ATF Agents noted that the total number of firearms sold in the transaction(s) had been increased by one additional firearm by writing over the original number on the ATF Form 4473.

16.     On or about July 20, 2022, ATF Mobile Field Office became aware of three (3) additional firearms recoveries that occurred in Reynosa, Tamaulipas, Mexico in June of 2022. All three (3) firearms were traced back to Carney's One Stop in Butler, Alabama.  BECTON, the owner of Carney's One Stop was identified as the purchaser of all three (3) recovered firearms.

17.     According to FTS T20220289634, Mexican Officials in Reynosa recovered a Diamond Back Arms, Inc., Model DB-15, 5.56 caliber rifle, serial number DB2769374, on or about June 13, 2022. The purchase date was listed as May 5, 2022, with a TTC of 39 days. The ship-to-date to Carney's One Stop was October 12, 2021.

18.     According to FTS T20220289626, Mexican Officials in Reynosa recovered a Diamond Back Arms, Inc., Model DB-15, 5.56 caliber rifle, serial number DB2769339, on or about June 13, 2022. The purchase date was listed as May 5, 2022, with a TTC of 39 days. The ship-to-date to Carney's One Stop was October 12, 2021.

19.     According to FTS T20220321558, Mexican Officials in Reynosa recovered a Diamond Back Arms, Inc., Model DB-15, 5.56 caliber rifle, serial number DB2177347, on or about June 29, 2022. The purchase date was listed as May 5, 2022, with a TTC of 55 days. The ship-to-date to Carney's One Stop was November 3, 2021.

20.     On or about August 15, 2022, ATF Mobile Field Office identified two (2) more firearm recoveries in Mexico. Both firearms were traced back to Carney's One Stop in Butler, Alabama. BECTON, the owner of Carney's One Stop was identified as the purchaser of both recovered firearms.

21.     According to FTS T20220360068, Mexican Officials in Trinitaria, Chiapas, recovered a Diamond Back Arms, Inc., Model DB-15, 5.56 caliber rifle, serial number DB2177348, on or about July 19, 2022. The purchase date was listed as May 5, 2022, with a TTC of 75 days. The ship-to-date to Carney's One Stop was November 3, 2021.

22.     According to FTS T20220386040, Mexican Officials in Tamaulipas recovered a Diamond Back Arms, Inc., Model DB-15, 5.56 caliber rifle, serial number DB2175876, on or about August 3, 2022. The purchase date was listed as May 19, 2022, with a TTC of 76 days. The ship-to-date to Carney's One Stop was October 21, 2021.

23.     On or about August 16, 2022, ATF conducted a proffer interview of BECTON. BECTON admitted to being approached by a Hispanic male, identified later in the interview as Elder Uriel ALVRIDREZ (herein referred to as ALVRIDREZ) regarding purchasing firearms in bulk while also expressing a desire to not complete any ATF Form 4473's for the purchases. BECTON was first contacted by ALVRIDREZ in October 2021. Based on the information

received from BECTON ATF positively identified ALVRIDEZ, a resident of San Juan, Texas. ATF also learned that ALVRIDREZ was also a subject in an ATF Birmingham investigation.

24.     Beginning in October 2021 through March 2021, ALVRIDREZ placed six (6) orders of firearms with BECTON. The total number of firearms transferred to ALVRIDEZ between October 2021 and March 2022 was one hundred and thirty-five (135) rifles and pistols.

25.     BECTON admitted to falsifying 4473s when ATF's NTC began contacting him regarding the trace requests. BECTON knew there were no 4473s for ALVIDREZ's firearms and would alter previously completed 4473s. He originally altered the ATF Forms because he did not want to use ALVIDREZ's information. However, after being contacted by ATF Agents, BECTON began using his own information on the fraudulent 4473s because he did not want to involve anyone else in the scheme.

26.     BECTON last had contact with ALVIDREZ in early August 2022. ALVIDREZ contacted BECTON to discuss the process for purchasing/obtaining a suppressor. ALVIDREZ and BECTON did not arrange a sale for a suppressor. ALVIRDREZ was only inquiring about the process of how to purchase one. BECTON had also spoken with ALVRIDREZ approximately three (3) weeks before, but no firearms were requested at that time.

27.     On or about August 17, 2022, ATF learned that ALVRIDREZ was returning to Alabama and wanting to purchase more firearms from BECTON. ALVRIDREZ wanted to purchase twenty (20) Diamondback AR style rifles and fifteen (15) Glock pistols from BECTON. BECTON told ALVRIDREZ that he would have to place an order with his distributor because he didn't have that much inventory.

8

28.     On or about August 22, 2022, ALVRIDREZ was interdicted on Interstate 59 in Jefferson County, Alabama and found to be in possession of twenty-two thousand dollars in U.S. currency. ATF Birmingham had learned that ALVIDREZ was on his way from Tennessee to Alabama to conduct a firearm purchase of approximately twenty (20) firearms from an Alabama resident. During this time, ATF Mobile also learned that ALVRIDREZ was continuing to contact BECTON regarding the status of his order for the Diamondback rifles and Glock pistols.

29.     On or about August 22, 2022, ATF interviewed ALVRIDREZ, who admitted to purchasing firearms from a private seller in the Birmingham area and from BECTON. ALVIDREZ admitted that after purchasing the firearms he would transport them to Texas. ALVRIDREZ stated that when he initially started buying firearms in October of 2021, he would post them for sale on Facebook. He would then sell the firearms to individuals in Texas for a profit. The sale of the firearms occurred shortly after he arrived in an area of Texas called "The Valley", which is the area from Brownsville to Rio Grande City along the United States-Mexico border.

30.     ALVIDREZ also stated he sold firearms via a private Facebook messaging group called "Twisted Tea." A user had to be invited and approved to join this group. ALVIDREZ would post the firearms for sale and buyers would contact him through the Facebook messenger application. In late 2021, ALVIDREZ was contacted by a Facebook user "PEPE MARTINEZ" regarding firearms ALVIDREZ had for sale. The person utilizing the "PEPE MARTINEZ" Facebook account then began placing orders with ALVIDREZ for specific firearms to include Glock pistols and AR-15 rifles. ALVIDREZ made bulk purchases from BECTON and his other Birmingham private citizen and transported the firearms to Texas. ALVRIDREZ admitted that

9

he would make a profit of approximately one hundred to two hundred dollars (per firearm) on the transfer of these firearms.

31. Via Facebook Messenger "PEPE MARTINEZ" would direct ALVIDREZ to residential addresses on the Texas / Mexico border to transfer the firearms. The transfer of firearms in Texas occurred with two (2) different individuals identified by ALVRIDREZ as Jose Luis CABALLERO and Juan CANTU CAVAZOS. Most of the communications between ALVIRDREZ (https://www.facebook.com/uriel.alvidrez), "PEPE MARTINEZ" (https://www.facebook.com/profile.php?id=100008308984074), Jose Luis CABALLERO (https://www.facebook.com/joseluis.caballero.90) and Juan CANTU-CAVAZOS (https://www.facebook.com/juan.cantu.7169) occurred via the Facebook Messenger application. ALVRIDREZ confirmed his Facebook address (https://www.facebook.com/uriel.alvidrez) and the Facebook addresses for the abovementioned Facebook profiles by directing ATF to the individual Facebook pages during his interview.

32. On or about August 23, 2022, ATF learned that "PEPE MARTINEZ" contacted ALVRIDREZ via Facebook. "PEPE MARTINEZ" was inquiring about the status of his order with ALVRIDREZ for the fifteen (15) Glock pistols and the twenty (20) rifles. ALVRIDREZ informed "PEPE MARTINEZ" that his contact (BECTON) had been unable to secure the order and he was returning to Texas without any firearms. "PEPE MARTINEZ" responded and reminded ALVIRDREZ that the money had already been sent.

33. Based upon the information provided by ALVRIDREZ and through law enforcement databases ATF was able to identify Jose Luis CABALLERO and Juan CANTU-CAVAZOS. CABALLERO has a current Texas driver's license and is a resident of Alamo,

10

Texas. CANTU-CAVAZOS was born in Mexico and was previously removed from the United Stated by Customs and Border Protection in 2006. Attempts to fully identify "PEPE MARTINEZ" are ongoing but it is believed that he is a Mexican citizen currently residing in Mexico.

## BACKGROUND CONCERNING FACEBOOK

34.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

36.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

39.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

40.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content

12

unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

41.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

46.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

13

47.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

48.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

49.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

50.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53.     Based on the foregoing, I request that the Court issue the proposed search warrant.

54.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the United States District Court for the Southern District of Alabama is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

56.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Thomas Nevin
Senior Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

THE ABOVE AGENT HAD ATTESTED
TO THIS AFFIDAVIT PURSUANT TO
FED. R. CRIM. P. 4.1(b)(2)(B) THIS 2nd DAY
OF SEPTEMBER 2022.

P. BRADLEY MURRAY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook account "Pepe Martinez" (https:// facebook.com/profile.php?id=100008308984074) that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California. A screenshot of the publicly available page for the account appears below:



## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including account "Uriel Alvidrez" (www.facebook.com/uriel.alvidrez): full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All contact and personal identifying information, including account "Pepe Martinez" (facebook.com/profile.php?id=100008308984074): full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(c)   All contact and personal identifying information, including account "Joeeluizz Caballero" (facebook.com/joseluis.caballero.90): full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including

city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(d)    All contact and personal identifying information, including account "Juan Cantu" (facebook.com/juan.cantu.7169): full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(e)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from June 1, 2021, to present;

(f)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from June 1, 2021, to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(g)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(h)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

2

(i)     All other records and contents of communications and messages made or received by the user June 1, 2021, to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(j)     All "check ins" and other location information;

(k)     All IP logs, including all records of the IP addresses that logged into the account;

(l)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(m)    All information about the Facebook pages that the account is or was a "fan" of;

(n)     All past and present lists of friends created by the account;

(o)     All records of Facebook searches performed by the account from June 1, 2021, to present;

(p)     All information about the user's access and use of Facebook Marketplace;

(q)     The types of service utilized by the user;

(r)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(s)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(t)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within **FOURTEEN (14) days** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) Engaging in the Business Without a License (Firearms); 18 U.S.C. § 932(b)(2) Straw Purchasing of Firearms; and 18 U.S.C. § 933 Trafficking in Firearms, involving Elder ALVRIDREZ since June 1, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating the illegal possession of firearms, the illegal purchase and transfer of firearms and illegally dealing in the business of firearms without a license and/or communications between ALVIDREZ and associates regarding ongoing illegal activity, which will be represented in, but not limited to, photographs, videos, audio recordings, comments, messages, etc.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4